25CA2165 Peo in Interest of HM 08-06-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA2165
Larimer County District Court No. 22JV30091
Honorable Laurie K. Dean, Judge

---

The People of the State of Colorado,

Appellant,

In the Interest of H.M., a Child,

and Concerning A.B. and D.S.,

Appellants.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE FREYRE
Johnson and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 6, 2026

---

William G. Ressue, County Attorney, Jennifer A. Stewart, Assistant County Attorney, Fort Collins, Colorado, for Appellee

Tomi L. Hanson, Counsel for Youth, Fort Collins, Colorado, for H.M.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant A.B.

Ainsley E. Baum, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant D.S.

¶ 1    In this dependency and neglect proceeding, A.B. (mother) and D.S. (father) appeal the juvenile court's judgment allocating parental responsibilities for H.M. (the youth) to a family friend. We affirm.

## I.    Background

¶ 2    In September 2022, the Larimer County Department of Human Services filed a petition in dependency and neglect regarding the then-nine-year-old youth. At that time, the youth was living with father and his wife (stepmother). Mother, who lives in Montana, had not seen the youth since 2015. The Department alleged concerns about father's protective capacities; specifically, that father had not protected the youth from stepmother's physical abuse. It also alleged that mother had abandoned the youth.

¶ 3    The juvenile court granted temporary legal custody of the youth to the Department. The Department initially placed the youth with her grandfather but later placed her in foster care.

¶ 4    The juvenile court adjudicated the youth dependent and neglected. Thereafter, it adopted treatment plans for both parents.

It also adopted a treatment plan for stepmother who had been deemed a special respondent in the case.

¶ 5     Father later filed a motion to return the youth to him and stepmother.  The Department then moved for an allocation of parental responsibilities (APR) for the youth to a family friend (kin) who had previously adopted one of mother's older children.  Mother filed a competing APR motion, requesting an APR to her.

¶ 6     Three years after the filing of the petition, the juvenile court held a six-day contested hearing on the motions.  After considering the evidence and taking the matter under advisement, the court granted an APR for the youth to kin.  The court granted mother weekly therapeutic visits and unsupervised phone calls with the youth, yearly summer visits in Montana, and monthly visits in Colorado.  The court granted father weekly supervised visits and phone calls with the youth but prohibited stepmother from attending any of father's visits until she completed clarification or reunification therapy.

## II.     Mother's Appeal

¶ 7     Mother contends that the juvenile court (1) erred by conditioning reunification with her on approval of an Interstate

Compact on the Placement of Children (ICPC) home study, and (2) abused its discretion by granting an APR to kin despite mother's fitness and the youth's desire to live with her. We discern no error.

### A. Additional Background

¶ 8 Approximately two years after the case opened, the Department moved the juvenile court to order that the youth be temporarily placed with mother for a "trial home visit." However, the Department specified that its request was conditioned on the approval of a then-pending ICPC home study for mother's home in Montana.

¶ 9 In October and November 2024, the juvenile court held a contested placement hearing on the Department's motion. The caseworker testified that mother had complied with her treatment plan and recommended that the youth be placed with mother in Montana. After considering the evidence, the juvenile court found that mother "ha[d] demonstrated that she [was] a fit parent and a safe and sober caregiver." It further found that it was in the youth's best interests to be placed with mother, "at least on a home trial basis." However, the court ordered that placement with mother could only occur if and when the ICPC home study was approved.

In January 2025, Montana denied the ICPC home study; consequently, the youth was not placed with mother at that time.

¶ 10    Nine months later, the juvenile court held the final APR hearing. On the fourth day of that hearing, a division of this court published *People in Interest of O.J.R.*, 2025 COA 78, holding that "the ICPC does not apply when a court grants custody of a child to an out-of-state parent." In its APR order, the juvenile court acknowledged that, based on *O.J.R.*, it could grant an APR to mother even though Montana had denied the ICPC home study. However, it found that the evidence presented at hearing "separate and apart from the . . . denial of the ICPC" established compelling reasons to grant an APR to kin, not mother. It then made specific findings about those compelling reasons before denying mother's APR motion.

## B.    ICPC Home Study

¶ 11    Mother contends that the juvenile court erred by requiring approval of an ICPC home study before placing the youth with her. As noted above, in its final APR order, the court acknowledged that an ICPC home study was not required to grant an APR to mother. Thus, we read mother's brief to challenge the court's November

4

2024 order, which conditioned placement of the youth with mother for a "home trial visit" on approval of the then-pending ICPC home study. Specifically, mother argues that the court's erroneous "refusal to return the child" to mother in November 2024 "ultimately resulted in the child being permanently placed in the custody of [kin]" instead of her. As a result, she urges us to reverse the APR judgment. We decline to do so.

1. Applicable Law and Standard of Review

¶ 12 The ICPC is an interstate agreement that facilitates the placement and provision of services to children being placed by one state's child protective services agency in a home in another state. *People in Interest of I.J.O.*, 2019 COA 151, ¶ 9. Under the ICPC, a "sending state" must notify a "receiving state" of its intent to send a child into the receiving state, and the receiving state typically completes a home study before accepting the child for placement in its state. § 24-60-1802, art. III(b), (d), C.R.S. 2023; *see O.J.R.*, ¶¶ 18-19 (noting that, even though the General Assembly enacted a revised version of the ICPC in 2024, the 2023 version remains in effect until thirty-five states pass the revised version). Nonetheless, when a Colorado court contemplates placing

a child with an out-of-state parent, a department is not required to initiate an ICPC home study. *See O.J.R.*, ¶¶ 26, 30.

¶ 13 Whether the juvenile court properly applied the ICPC is a question of law that we review de novo. *Id.* at ¶ 13.

## 2. Analysis

¶ 14 We begin by acknowledging that, if the juvenile court had the benefit of the *O.J.R.* opinion at the placement hearing in November 2024, it may have allowed the child to go to Montana for the "trial home visit" regardless of the outcome of the ICPC home study.

¶ 15 However, nothing in *O.J.R.* suggests that a department is *prohibited* from initiating an ICPC home study or that a court is *prohibited* from requiring its approval before placing a child with an out-of-state parent. To the contrary, the *O.J.R.* division noted that its "conclusion d[id] not excuse Colorado juvenile courts and departments of human services from ensuring that children are safe when placed with out-of-state parents." *Id.* at ¶ 28. And one way in which a court and department may seek to ensure a child's safety when placing a child out-of-state is through an ICPC home study.

¶ 16    Here, at the placement hearing, the juvenile court found that mother was fit and that placement with her was in the youth's best interests.  But it also noted that it still had some concerns about placement with mother based on an incident that happened a month before the hearing.  And at that point, the court had the authority to condition placement on requirements similar to those in an ICPC home study approval based on the court's authority to enter other protective measures to ensure ongoing safety during the "trial home visit."  *See O.J.R.*, ¶¶ 28-29; *see also* § 19-3-508(1)(a), C.R.S. 2025 (after an adjudication has been entered, a juvenile court "may place the child in the legal custody of one or both parents . . . , with or without protective supervision, under such conditions as the court deems necessary and appropriate").  To that end, the court found that approval of the ICPC home study would ensure that there was "support in the face of uncertainty" while the youth was temporarily placed with mother.  That finding was supported by the caseworker's testimony that an approved ICPC home study would allow a Montana caseworker to "conduct the monthly home visits and provide support to [mother's] household" during the ninety-day "trial" placement.  Thus, because the court

was taking into consideration the child's safety and wellbeing —
which it has authority to do under other statutory provisions other
than the ICPC — we cannot say that the juvenile court erred when
it conditioned temporary placement with mother on approval of the
ICPC home study.

¶ 17    Further, even if the juvenile court had placed the youth with
mother in November 2024, it is speculative to say that it would have
ultimately granted an APR to mother instead of kin.  There is no
way to know how the "trial home visit" would have gone or what
permanency option would have been in the youth's best interests.
And, at time of the APR hearing, the court could not base its
determination on circumstances that might have existed if the
youth had been placed with mother earlier in the case.  Rather, it
was required to determine what was in the youth's best interests
based on the circumstances that actually existed at the time of the
APR hearing.  *See People in Interest of N.G.G.*, 2020 COA 6, ¶ 29.
And that is what the juvenile court did.  Specifically, it found that
by the time of the APR hearing, it had "additional information" and
"new evidence" that it "did not have at the hearing in November

2024." Based on that information and evidence, the court denied mother's APR motion.

¶ 18 In sum, we cannot say that the juvenile court's November 2024 decision to condition placement with mother on an approved ICPC home study was erroneous. Nor can we say that the placement decision had any effect on the court's ultimate APR determination. Thus, in relation to the ICPC and *O.J.R.*, we discern no reason to reverse the APR judgment.

## C. Denial of APR to Mother

¶ 19 Mother further contends that the juvenile court abused its discretion by denying her APR motion because the court had previously found she was fit and the youth wanted to live with her, not kin. We disagree.

### 1. Applicable Law and Standard of Review

¶ 20 When allocating parental responsibilities in a dependency and neglect proceeding, the juvenile court must consider the legislative purposes of the Children's Code under section 19-1-102, C.R.S. 2025. *People in Interest of J.G.*, 2021 COA 47, ¶ 18. The overriding purpose of the Children's Code is to protect a youth's welfare and safety by providing procedures through which the youth's best

9

interests can be served. *Id.* at ¶ 19. Consequently, the court must allocate parental responsibilities in accordance with the youth's best interests. *Id.*

¶ 21　Even so, parents maintain a fundamental liberty interest in the care, custody, and control of their children. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000). In *Troxel,* the Supreme Court recognized that a parent who is adequately caring for their child — a fit parent — is presumed to act in their child's best interests. *Id.* at 68-69. Thus, in dependency and neglect proceedings, if the court determines that a parent has become fit, then it must apply the *Troxel* presumption before awarding an APR to a nonparent. *See J.G.,* ¶¶ 21, 27; *N.G.G.,* ¶¶ 18-19. Applying the *Troxel* presumption requires the court to accord "at least some special weight to the parent's own determination" regarding the youth's best interests. *J.G.,* ¶ 21 (quoting *Troxel,* 530 U.S. at 70).

¶ 22　The *Troxel* presumption may be rebutted by clear and convincing evidence that the parent's determination is not in the youth's best interests, while the nonparent's request is. *See N.G.G.,* ¶ 16; *In re Parental Responsibilities Concerning B.J.,* 242 P.3d 1128, 1132 (Colo. 2010). The court must also identify special factors that

support entering an order contrary to the parent's wishes. *J.G.*, ¶ 22; *see also In Interest of C.T.G.*, 179 P.3d 213, 226 (Colo. App. 2007) (overturning a visitation order based on *Troxel* when the nonparent failed to present evidence of special circumstances to justify an order contrary to the parents' wishes).

¶ 23 Allocating parental responsibilities is a matter within the sound discretion of the juvenile court. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15. A court abuses its discretion when it misapplies the law or its ruling is "manifestly arbitrary, unreasonable, or unfair." *People in Interest of M.H-K.*, 2018 COA 178, ¶ 60. We will not disturb a court's factual findings unless they are unsupported by the record. *See J.G.*, ¶ 17. Whether a court applied the correct legal standard in making its findings, however, is a question of law that we review de novo. *Id.*

### 2. Analysis

¶ 24 In its APR order, the juvenile court found that the evidence established "compelling reasons" to deny mother's request for an APR and grant an APR to kin based on the "unique circumstances of this case." In relation to mother, the court found, with record support, the following:

11

- The two children living in mother's home had been subject to a dependency and neglect case in Montana, and mother had not resolved the Montana department's safety concerns. While this case was still pending, the Montana case closed, but only because mother's husband in Montana had been granted full custody. The Montana department did not believe that mother should be allowed to care for the children by herself.

- The children living in mother's home were not up to date on their medical and dental needs, and they had several unexcused school absences during the previous school year. Based on that information, there were concerns that if the youth lived with mother, her "special needs" would not be met. Specifically, the youth had been diagnosed with autism spectrum disorder and an intellectual disability, which required her to engage in ongoing therapy and special education services.

- In the three weeks before the APR hearing, mother had not attended virtual therapy with the youth or contacted her at all. This was particularly concerning because

mother had withdrawn from contact with the youth at other times throughout the proceedings as well. Mother's "cyclical withdrawals" were "troubling" for the youth, and she did not understand why mother was not consistently contacting her.

¶ 25 Mother argues that the juvenile court abused its discretion by granting an APR to kin because the court had found that she was fit in November 2024. We reject her contention because, even assuming that mother was still fit at the time of the APR hearing, that fact, on its own, was not dispositive of whether a court was required to grant an APR to mother. Rather, "parental deficiencies less serious than unfitness may give rise to a compelling reason not to return the child home when considered in light of the [youth's] physical, mental, and emotional conditions and needs." *People in Interest of C.M.*, 116 P.3d 1278, 1283 (Colo. App. 2005).

¶ 26 While the juvenile court questioned whether its November 2024 fitness finding required it to presume mother was fit for purposes of determining the APR eleven months later, it nonetheless accounted for mother's fitness by affording her the *Troxel* presumption. Specifically, it assumed that mother's

13

"preferences" for custody "controlled." It then found, by clear and convincing evidence, that there were compelling reasons for denying the APR to mother. It concluded that those compelling reasons also constituted "special factors" justifying an APR to kin. In other words, it found that mother's *Troxel* presumption had been rebutted by clear and convincing evidence; that entering an order contrary to mother's wishes was justified; and that an APR to kin was in the youth's best interests. Thus, even assuming mother was fit, the juvenile court did not enter the APR to kin in violation of her *Troxel* rights. *See N.G.G.*, ¶¶ 15-16.

¶ 27  We also reject mother's argument that the juvenile court abused its discretion by entering an APR that was contrary to the youth's desire to live with her in Montana. A youth's wishes are just one factor in determining what is in their best interests. And in its APR order, the court acknowledged that the youth preferred to live with mother. Nonetheless, as described above, the court had several concerns about mother's ability to meet the youth's needs and found that an APR to her would not be in the youth's best interests. Rather, it found that an APR to kin was in the youth's best interests because it would provide the permanency and

stability she needed; allow her to foster relationships with her biological parents, siblings, and extended family; and provide continuity with her treatment providers. The record supports those findings. And we cannot reweigh the evidence. *People in Interest of K.L.W.*, 2021 COA 56, ¶ 62; *see also B.R.D.*, ¶ 15 (when there is record support for the trial court's findings, its resolution of conflicting evidence is binding on review).

¶ 28 Based on the foregoing, we discern no abuse of discretion in the juvenile court's decision to grant an APR to kin instead of mother.

## III. Father's Appeal

¶ 29 Father contends that the juvenile court abused its discretion by (1) allowing the court appointed special advocate (CASA) to provide expert testimony; and (2) denying his motion to return the youth home when the Department had failed to make reasonable efforts to provide family therapy, which had been inappropriately conditioned on stepmother's completion of clarification therapy. We reject both contentions.

## A. Expert Testimony

¶ 30 Father argues that the juvenile court abused its discretion by allowing the CASA to testify as an expert in education without making the findings required by *People v. Shreck*, 22 P.3d 68 (Colo. 2001). We decline to address this argument on the merits because father failed to preserve it.

### 1. Applicable Law

¶ 31 The admissibility of expert testimony is governed by *Shreck* and CRE 702. *People in Interest of A.F.*, 2025 COA 76, ¶ 16. Thus, upon objection, the juvenile court must "make specific findings as to the four *Shreck* factors — reliability, qualifications, usefulness, and CRE 403 — before admitting such testimony." *Id.* at ¶ 20. However, to trigger this requirement, a party must "state a specific challenge pursuant to *Shreck*." *See People v. Rector*, 248 P.3d 1196, 1201 (Colo. 2011); *see also A.F.*, ¶ 13 n.2 (noting that the juvenile court was required to make *Shreck* findings when a party "raised detailed and specific objections as to each prong of the *Shreck* analysis").

16

## 2. Analysis

¶ 32     On appeal, father contends that the juvenile court was required to make *Shreck* findings because both he and mother objected to the CASA's expert testimony.[1] But father objected to the CASA's expert testimony based on relevance and the Department's failure to file an expert report. And mother objected based on the Department's expert witness disclosure, arguing did not comply with the requirements of C.R.C.P. 26. Thus, neither parent presented a specific objection pursuant to *Shreck*. *See Bocian v. Owners Ins. Co.*, 2020 COA 98, ¶¶ 54-55 (a party's challenge to expert testimony based on relevance and issues with disclosure did not invoke one or more of the *Shreck* factors).

¶ 33     Accordingly, because the *Shreck* objections father raises on appeal were not presented to the juvenile court, father's appellate claim is not preserved, and we decline to address it. *See People in Interest of M.B.*, 2020 COA 13, ¶ 14 (we do not address arguments

---

[1] We have not addressed whether one party's objection can preserve an issue for the other party. *See People v. Turner*, 2022 CO 50, ¶ 15 n.2. Here, we need not decide this issue because we conclude that even if mother's objection could have preserved father's *Shreck* claim, it was insufficient to do so.

raised for the first time on appeal); *see also People v. Ujaama*, 2012 COA 36, ¶ 37 (explaining that issues are unpreserved when the grounds raised on appeal are different from those raised below).

### B. Family Therapy

¶ 34 Father also contends that the juvenile court abused its discretion by denying his motion to return the youth to him, and instead, granting an APR to kin. To get there, he argues that the Department failed to make reasonable efforts to reunite him with the youth because it prevented him from engaging in family therapy until stepmother completed clarification or reunification therapy. He asserts that if he had been able to engage in family therapy with the youth on his own, then the youth could have returned home. We are not persuaded for three reasons.

¶ 35 First, to the extent father argues that the Department failed to make reasonable efforts to reunite him with the youth, his argument is unpreserved. True, in a dependency and neglect case, a department must make reasonable efforts to rehabilitate the parent and reunite the family before a court may enter an APR to a nonparent. *See People in Interest of A.S.L.*, 2022 COA 146, ¶ 20. But to preserve an argument for appeal, a party must alert the trial

court to the issue so that the court has an adequate opportunity to make findings of fact and conclusions of law. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 18; *Forgette v. People*, 2023 CO 4, ¶ 21; *see also People in Interest of K.L-P.*, 148 P.3d 402, 403 (Colo. App. 2006) (arguments never presented to, considered by, or ruled upon by a juvenile court may not be raised for the first time on appeal).

¶ 36     At the APR hearing, father did not assert that the Department failed to make reasonable efforts or argue that the Department's APR motion should be denied on that basis. In fact, he did not mention reasonable efforts at any point during the six-day hearing. In other words, the juvenile court was not on notice that father believed the Department's efforts were deficient. *See Forgette*, ¶ 21. Consequently, the court did not make specific findings as to whether the Department made reasonable efforts. Thus, addressing father's reasonable efforts claim would require us to make factual findings instead of reviewing them. We cannot do that. *See People in Interest of J.L.*, 121 P.3d 315, 318 (Colo. App. 2005) ("[W]e cannot make factual findings of our own."). Accordingly, we decline to address the merits of father's reasonable efforts argument. *See M.B.*, ¶ 14; *K.L-P.*, 148 P.3d at 403.

¶ 37 Second, to the extent father asserts that the juvenile court or the Department prevented him from complying with his treatment plan by conditioning family therapy on stepmother's participation in clarification therapy, the record belies that assertion. Father points us to a hearing that occurred in May 2025 as record support for his argument. At that hearing, the court did not order that stepmother needed to complete clarification therapy before family therapy could resume. Rather, it ordered that stepmother have no contact with the youth until stepmother notified the Department that she was ready and willing to engage in family therapy. Thus, the court's order did the opposite of preventing father from engaging in family therapy — it reiterated that family therapy could continue despite the Department's concerns about stepmother.

¶ 38 The record also shows that the Department attempted to follow the order for family therapy to continue. The caseworker testified that after the first family therapist terminated his services, she made at least five referrals to family therapy providers. However, father and stepmother refused to work with all but one of those providers, and that provider ultimately declined to work them. Although father and stepmother agreed that they would provide

names of family therapists they wanted to work with, by the time of the APR hearing, they had not done so. Thus, the record does not support father's assertion that either the court or the Department prevented him from engaging in the family therapy component of his treatment plan.

¶ 39 Third, to the extent father argues that the juvenile court abused its discretion by relying on his "inability to continue family therapy as a basis for denying [his motion to] return home," we disagree. As explained above, the record does not indicate that father was unable to engage in family therapy. Further, the court did not rely on the lack of family therapy as the basis for denying father's motion. Rather, it found, with record support, that father had been "unable to ensure that [the youth would] be emotionally or physically safe with [stepmother]." As an example of father's inability to ensure the youth's safety, the court noted that father was unable to protect the youth from stepmother "even in the highly structured and supervised environment of family therapy," which ultimately resulted in the therapist terminating family therapy. In other words, the court denied father's motion to return the youth home based on father's inability or unwillingness to

21

protect the youth from stepmother, not the fact that family therapy had been terminated.

¶ 40 Accordingly, in relation to family therapy, we discern no abuse of discretion in the court's order denying father's motion to return the youth home to him and granting the Department's motion for an APR to kin.

## IV. Disposition

¶ 41 The judgment is affirmed.

JUDGE JOHNSON and JUDGE KUHN concur.